J-S81019-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: J.W. & A.W., MINOR CHILDREN | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: M.W. | : | |
| | : | |
| | : | No. 1321 MDA 2017 |

Appeal from the Order Entered August 18, 2017
In the Court of Common Pleas of Lycoming County
Orphans' Court at No: 6547

BEFORE: PANELLA, STABILE, and PLATT,* JJ.

MEMORANDUM BY STABILE, J.:                    **FILED FEBRUARY 06, 2018**

M.W. ("Mother") appeals from the August 18, 2017 decree in the Court of Common Pleas of Lycoming County involuntarily terminating her parental rights to her twin sons, J.W. and A.W. (collectively, "the Children"), born in August of 2016.[1]  Upon careful review, we affirm.

In its opinion accompanying the subject decree, the orphans' court set forth the factual and procedural history of this case, which the testimonial evidence supports.  As such, we adopt it herein.  **See** Trial Court Opinion, 8/18/17, at 2-12.

---

* Retired Senior Judge assigned to the Superior Court.

[1] The orphans' court voluntarily terminated the parental rights of W.F. ("Father") by decree entered on July 12, 2017.  Father did not file a notice of appeal.

By way of background, Mother suffers from an intellectual disability, and she functions cognitively as an eight-to-ten-year-old child. *Id.* at 7-8. She is unable to attend to her personal hygiene, and she is unable to advocate for herself. *Id.* at 5-6. Mother also suffers from poor mental health, which was unspecified in the record. N.T., 8/15/17, at 31.

The Lycoming County Children and Youth Agency ("Agency") first became involved with Mother with respect to her oldest child, a female, to whom she voluntarily terminated her parental rights in May of 2016. *Id.* at 2. At the time of the Children's birth in August of 2016, Mother was under the supervision of the Lycoming County Adult Probation Office,[2] and she resided in a mental health group home. *Id.* The court immediately placed the Children in the emergency protective custody of the Agency, and the court adjudicated them dependent on August 11, 2016. *Id.*

Mother was granted supervised visits with the Children, during which the Agency supervisor attempted to teach Mother appropriate parenting skills. N.T., 8/15/17, at 39-40. In February of 2017, Mother was removed from the mental health group home due to, *inter alia*, not following the rules. Trial Court Opinion, 8/18/17, at 4; N.T., 8/15/17, at 81. Mother then resided in a personal care home, during which time she did not consistently attend

---

[2] Mother completed her probation on July 25, 2017. N.T., 8/15/17, at 81. The record does not include any evidence regarding Mother's underlying crimes.

supervised visits with the Children. Trial Court Opinion, 8/18/17, at 4. In fact, prior to her visit on April 24, 2017, Mother missed eight consecutive visits. N.T., 8/15/17, at 42. After her April supervised visit, Mother did not visit with the Children again until July 24, 2017, a period of three months. *Id.* at 49.

The Children have resided with the same foster parents since birth, and their foster parents are a pre-adoptive resource. J.W. suffers from hydrocephaly, a malformation of the skull. *Id.* at 73. At two months old, J.W. was diagnosed with torticollis, a condition involving the neck muscles that causes the head to twist to one side, which, after treatment, the record indicates has resolved. *Id.* at 75. However, J.W. receives physical therapy because he is not walking or showing the foundational skills for walking. *Id.* at 75-76. In addition, the Children both suffer from reactive airway disease. *Id.* at 74-75.

On May 1, 2017, the Agency filed a petition for the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (b). The orphans' court held a hearing on August 15, 2017. The Agency presented the testimony of Linda A. Bloom, Mother's case manager from the Lycoming/Clinton County Mental Health/Intellectual Disability Program; and Bruce Anderson, a licensed clinical psychologist who performed multiple evaluations of Mother, some, but not all of, which related to the dependency of Mother's older female child, to whom she eventually

relinquished her parental rights. In addition, the Agency presented the testimony of Mary Wilson, the Agency caseworker who supervised Mother's visits with the Children; K.N., the Children's foster mother; and Crystal Minnier, the Agency caseworker from the time of the dependency of Mother's female child to the time of the subject proceedings. Mother testified on her own behalf.

By decree dated August 18, 2017, and entered on August 21, 2017, the orphans' court involuntarily terminated Mother's parental rights. Mother timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Mother raises the following issues for our review:

1. Whether the [orphans'] court erred in terminating the parental rights of [Mother] pursuant to 23 Pa.C.S. § 2511(a)(1) when [Mother] has not evidenced a settled purpose of relinquishing parental claim to the [C]hildren and failed to perform her parental duties[?] [Mother] made an effort to have a relationship with her [C]hildren.

2. Whether the [orphans'] court erred in terminating the parental rights of [Mother] pursuant to 23 Pa.C.S. § 2511(a)(2) when there was insufficient evidence that the [C]hild(ren) were without essential parental care, control or subsistence necessary and causes of the incapacity cannot or will not to be remedied[?] Mother made some progress to remedy the incapacity.

3. Whether the [orphans'] court erred in terminating the parental rights of [Mother] pursuant to 23 Pa.C.S. § 2511(a)(5) in finding that the conditions which led to removal or placement of the [C]hildren continue to exist and they cannot be remedied within a reasonable period of time and that termination would best serve the needs and welfare of the [C]hildren[?]

4. Whether the [orphans'] court erred in terminating the parental rights of [Mother] when there was insufficient evidence that the best interests of the [C]hildren would be served by termination, pursuant to 23 Pa.C.S. § 2511(b)[?]

Mother's brief at 6-7.

We consider Mother's issues according to the following standard:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. § 2101-2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

- 5 -

We need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. ***In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). In this case, we conclude that the certified record supports the orphans' court's decision to terminate Mother's parental rights pursuant to Sections 2511(a)(2) and (b), which provide as follows.

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

This Court has stated as follows:

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted)). Further, we have stated, "[t]he grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

With respect to Section 2511(b), this Court has stated that, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id*. (citation omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted).

On appeal, Mother argues that the record evidence is insufficient to terminate her parental rights under Section 2511(a)(2). Specifically, Mother argues that the testimony revealed that she was able to hold the Children, feed their bottles, and change their diapers. In addition, Mother baldly asserts that the Agency "was quick to file for termination . . . not giving [Mother] the chance to prove that she could continue to care for the [C]hildren as they developed further." Mother's brief at 19. For the following reasons, we discern no abuse of discretion by the court.

The orphans' court found as follows.

> There was an abundance of testimony regarding Mother's inability to properly attend to her own basic needs, including her hygiene, and her inability to advocate for herself in order to protect herself from being taken advantage of or abused. There was even more testimony regarding Mother's inability to properly attend to the needs of young children. As testified to by Bruce Anderson, Mother's intellectual disability causes her to function cognitively as a child in the 8 to 10 year old range. This, coupled with an upbringing where she was not properly nurtured and therefore lacks the abilities/instinct to nurture others, has led the [c]ourt to find that Mother's incapacity would cause the Children to be without proper parental care necessary for their physical and emotional well-being. Moreover, this incapacity has been present since before the Children's birth, and according to Mr. Anderson, is likely to be permanent.

Trial Court Opinion, 8/18/17, at 15. Mr. Anderson's testimony supports the court's findings.

Mr. Anderson testified first with respect to his opinion at the time of his psychological evaluation on Mother in August of 2015, which related to her

female child to whom she relinquished her parental rights in May of 2016. He testified on direct examination:

> Q. [W]hat was the finding that you made in your initial report . . . with respect to [Mother's] ability to parent a child or care for a child?
>
> A. I was very clear at that time that I did not feel that [Mother] was capable of caring for a child on her own, meaning without . . . another competent adult with her at all times. I am not talking about someone coming in for an hour or two a week to help her out. I mean, constantly. That I did not feel that she could care for the child without that. On her own, certainly not. And even the other person had to be a competent adult who was there pretty much all the time.

N.T., 8/15/17, at 20. Mr. Anderson performed the next evaluation of Mother on May 24, 2017, after the Children's adjudication, when they were nine months old. He testified that his opinion regarding Mother's parenting inability did not change in a subsequent evaluation. *Id.* at 21. Further, Mr. Anderson testified that, at the time of his 2017 evaluation, he did not "see anybody that was with [Mother] constantly who would be a competent adult to help her care for the [C]hild[ren]." *Id.* at 21-22.

With respect to whether Mother's parenting inability will improve, Mr. Anderson testified:

> Q. I know that nothing has changed in your opinion from two years ago to today with respect to [Mother's] ability to care for a child or children. Do you expect that that would change in the near future or in the future at all based on your assessment of her?
>
> A. No, I do not expect much change in that regard. [Mother] has intellectual disabilities. She is limited to some extent. That . . . itself is not the issue. She has also had some significant mental

health problems and her upbringing in which she told me about, the several times that we met in the past prior to this current interview[,] tells me that . . . she was not nurtured and cared for properly herself[;] therefore[,] [she] does not have that almost instinctual sense that many people have who were properly nurtured and cared for as children. When they become parents, they pretty much do what was done to them. And for most people that has been good enough. In [Mother's] case she was not well cared for[.] [S]he was mistreated. And so put all that together, I continue to feel that will not change, her background certainly will not change, and her abilities to learn new approaches to managing or caring for the children are not going to change. . . .

*Id.* at 31.

The orphans' court found that Mother demonstrated parental incapacity during supervised visits with the Children, as follows.

The [c]ourt is concerned about Mother's interactions with the Children at the visits in which she attended. . . . Mother has had to be continuously prompted to perform even the most basic parental duties, and does not take direction from the supervisors well. Because Mother has so infrequently attended visits, she does not retain any of the instructions they provide her regarding how to properly, and gently, handle the Children so that they feel safe and comfortable. Mother truly has no understanding of the different stages that children go through developmentally, nor how to appropriately respond to their present, and changing, needs.

Trial Court Opinion, 8/18/17, at 16. The testimony of Mary Wilson, the Agency caseworker who supervised the visits, supports the court's findings.

Ms. Wilson testified that she instructed Mother during the supervised visits on how to care for the Children, including how to hold them, feed them, speak to them, and nurture them. N.T., 8/15/17, at 44-45. She explained that Mother was not gentle with the Children. *Id.* at 45. Specifically, she testified that, during the visit on April 24, 2017, at which time the Children

were approximately eight months old, Mother, in attempting to move J.W., pulled him by the leg across a blanket on the floor, rather than picking him up to move him. *Id.* Likewise, during the visit on July 24, 2017, when the Children were eleven and one half months old, Mother picked up A.W. by one arm. Ms. Wilson stated that Mother "was told immediately you cannot . . . pick up a child that way." *Id.* at 51.

Ms. Wilson testified that, "when you look at [Mother] and you make the eye contact and try to explain to her what is or is not going well [during the supervised visits], you do not get any response. She does not respond like, could you tell me again or could you show me. You know, it is just no response. [S]he just kind of looks at you." *Id.* at 47. On cross-examination by Mother's counsel, Ms. Wilson testified:

> Q. Whenever you would make a suggestion about, say, switching positions, was [Mother] open to those suggestions?
>
> A. She would make eye contact with me and she would look at me. She would maybe start something, but she would not follow through, no.

*Id.* at 62.

Finally, Ms. Wilson testified on direct examination with respect to her concern for the Children's safety if they are placed in Mother's care:

> Q. In your observations of [Mother] caring for the [C]hildren at the visits, do you have concerns for their safety when they're in her care, if they were in her sole care?
>
> A. I would. I would.
>
> Q. What are those concerns?

- 11 -

A. Supervision is . . . a big one where she gets . . . distracted. Time management for . . . [C]hildren. We even worked on . . . while maybe one little guy was quiet and being good, maybe this one needs to be fed. . . . The [lack of] bonding and nurturing. . . . I would be concerned that the [C]hildren would be either confined to a crib, or playpens. . . .

*Id.* at 60.

In addition, the testimony of Crystal Minnier, the Agency caseworker for this family since the dependency of Mother's female child, was consistent with that of Mr. Anderson and Ms. Wilson. Ms. Minnier explained on direct examination as follows.

Q. Have you had any opportunity to either observe the visits in whole or in part since you have been the caseworker?

A. Yes. . . .

Q. What kind of observations can you relay to the [c]ourt[?]

A. I think I was in a unique position because I was the caseworker previously and I was involved in visitation with her other child. From my vantage point . . . [Mother] does not appear to have an understanding of [the Children's] needs. They're like a doll baby to her.

. . .

If she was the sole caregiver and she wanted to go -- someone stopped at her house that she had not planned on, she would not -- in my opinion, she would up and leave and there [the Children would] be. If she was busy doing something she wanted to do and it was time to feed [the Children], she would do what she wanted to do first and -- and they might not get fed. Do I think that that's deliberate? No. . . . And that is why we recommended the need[] for a group home. That's why we had all the services we put in for her. And I think the most stable she was, unfortunately, was when she was being monitored by adult probation, who I think really put her needs as paramount and did an excellent job in supervising her. . . .

- 12 -

N.T., 8/15/17, at 87-90.

Based on the foregoing testimonial evidence, we conclude that the record overwhelmingly supports the orphans' court's decision to involuntarily terminate Mother's parental rights pursuant to Section 2511(a)(2). Indeed, Mother's repeated and continued incapacity has caused the Children to be without essential parental care, control or subsistence necessary for their physical and mental well-being. Further, the evidence demonstrates that Mother's parental incapacity cannot or will not be remedied.

With respect to Section 2511(b), Mother argues that the record evidence does not support terminating her parental rights because Mr. Anderson, in performing his psychological evaluation, did not observe her with the Children to determine if any bond exists. *See* Mother's brief at 26. Mother relies on *In re C.P.*, 901 A.2d 516 (Pa. Super. 2006), wherein this Court reversed the order terminating the mother's parental rights to her three-and-one-half-year-old daughter after concluding that the Philadelphia Department of Human Services did not sustain its burden of proof pursuant to Section 2511(b). We remanded the case to give the parties an opportunity to present further testimony regarding the emotional bond between the mother and her daughter and the effect that termination of her parental rights would have on the child. In this case, we discern no abuse of discretion.

We are governed by the following settled case law:

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. *In re K.K.R.S.*, 958 A.2d 529, 533-536 (Pa. Super. 2008). The mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2003). As we explained in *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010),

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).

Furthermore, our Supreme Court has stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, *supra* at 268. The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* Court observed that, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When

- 14 -

courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

Instantly, the orphans' court found as follows in terminating Mother's parental rights pursuant to Section 2511(b).

> [A]lthough Mother may love the Children, there is no bond between her and the Children. Due to the young age of the Children and the fact that they have been in placement since their release from the hospital, [foster parents] are the only family A.W. and J.W. have ever known. Since the Children were declared dependent, Mother has attended only 47 of the 80 visits offered. At the visits, the Children do not gravitate towards her. In fact, in the most recent visits, the Children have displayed extreme anxiety when [foster mother] leaves the room, and for several hours following the visits. Termination of Mother's parental rights will not destroy an existing and necessary bond because the [c]ourt does not feel as though there exists a bond between the Children and Mother. To the contrary, it is evident to the [c]ourt that the Children are extremely bonded to [foster parents], and [foster parents] are extremely bonded to the Children. If efforts were continued to reunify A.W. and J.W. with Mother[,] and the Children were to be removed from their current home, it would be traumatic to them.

Trial Court Opinion, 8/18/17, at 19 (citation to record omitted).

Upon careful review, there is no evidence of record that a parent-child bond exists between Mother and the Children. Therefore, it was reasonable for the orphans' court to infer that none exists. *See In re K.Z.S.*, *supra.* As described *infra*, the evidence demonstrates that the Children are bonded to their foster parents, who are a pre-adoptive resource.

Ms. Wilson, the Agency caseworker who observed the interactions between Mother and the Children during supervised visits, testified that no parent-child bond was visible between them. N.T., 8/15/17, at 50.

Specifically, she testified that, during the visit on July 24, 2017, the Children, then nearly twelve months old, crawled on the floor and did not respond to Mother who was also on the floor trying to play with them. *Id.* at 49-50. Ms. Wilson explained as follows on direct examination.

> [U]sually when a parent gets down the floor and your baby's on the floor, they — what they want to do is they want to crawl all over you. . . . These boys at no time during that visit did they go towards Mother to get on her. . . . They . . . would play with toys. [O]n a couple of occasions [the Children] crawled out going towards the door [to the room].

*Id.* at 50-51. Ms. Wilson also testified that Mother could not distinguish the Children from one another as recently as the July 31, 2017 visit, when the Children were nearly twelve months old. Although they are twin boys, Ms. Wilson testified that A.W. "is much larger" than J.W., and A.W. has a "big grin with a full mouth of teeth." *Id.* at 54.

Mother correctly asserts that Mr. Anderson, the clinical psychologist, did not observe Mother and the Children in performing his evaluation. However, he opined with respect to the effect on the Children if they no longer saw Mother as follows.

> Q. [W]ould you have concerns . . . about trauma to the [C]hildren not seeing [Mother]?
>
> A. No, I would not. I would not. [T]hey went from zero to one [years old] living with their resource parents. Those are the people that cared for them, those are the people that love them, and they in turn have learned to love them, the resource parents. [The Children are] so young that -- that they never had a chance in my mind to attach to [Mother]. They attached to the resource parents, not to [Mother]. It's a different story when kids are older

> when you get into court hearing talk about emotional bonds. It's not the same with infants.

N.T., 8/15/17, at 33-34. Mr. Anderson assessed the bond between the foster parents and the Children and determined that the Children are "very attached" to them, and the foster parents are "very attached" to the Children. *Id.* at 26-27.

K.N., the Children's foster mother, testified with respect to the four supervised visits prior to the subject proceedings. Specifically, she testified that the Children's behavior after those visits deteriorated to "screaming, . . . crying," and not wanting to be put down by the foster parents after the visits. *Id.* at 70-71.

We conclude that the testimonial evidence supports the court's decision that terminating Mother's parental rights will serve the Children's developmental, physical, and emotional needs and welfare pursuant to Section 2511(b). On this record, no parent-child bond exists. Even if one did exist, the record demonstrates that the Children's safety and well-being would be at risk if they were reunified with Mother. The Children are fortunate to have a parent-child relationship with their foster parents, who are meeting their needs, and who desire to adopt them.

Finally, we reject Mother's reliance on *In re C.P.*, *supra*. In that case, we stated that the expert based his opinion that termination was appropriate solely on the mother's parental incapacity under Section 2511(a)(2). In doing so, the expert omitted any consideration of the child's relationship with the

- 17 -

mother and the effect termination would have on that relationship. Likewise, in *In re C.P.*, the agency social worker did not testify to what impact termination of the parent-child relationship would have on the child. In contrast, in this case, we conclude that the evidence clearly and convincingly demonstrates that the Children will not suffer any detriment if Mother's parental rights are terminated. Accordingly, we affirm the decree.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 02/06/2016